306 Ga. 687
FINAL COPY

S19A0747.  BRYANT v. THE STATE.

ELLINGTON, Justice.

Following a jury trial, Jason Bryant ("the appellant") was
convicted of the malice murder of his wife, Angelina Bryant
("Bryant"), the aggravated assault of Trina Nwoke, and making a
terroristic threat.[1] He appeals, challenging the sufficiency of the

---

[1] The crimes occurred on March 7, 2012. On May 31, 2012, a DeKalb
County grand jury returned an indictment charging the appellant with malice
murder (Count 1), felony murder (predicated on the aggravated assault of
Bryant) (Count 2), aggravated assault (of Bryant by shooting her) (Count 3),
aggravated assault (of Nwoke) (Count 4), aggravated assault (of Fallion
Simmons) (Count 5), and making a terroristic threat (Count 6). Following an
April 28-30, 2014 jury trial, a directed verdict of acquittal was granted as to
Count 5, and the appellant was found guilty of the remaining charges. On April
30, 2014, the trial court sentenced the appellant to life imprisonment without
parole on Count 1, 20 years' imprisonment on Count 4, and five years'
imprisonment on Count 6, to be served consecutively. The court did not enter
sentences on Counts 2 and 3, which were vacated as a matter of law or merged
for purposes of sentencing. See *Atkinson v. State*, 301 Ga. 518, 520-521 (2) (801
SE2d 833) (2017). With the assistance of new post-conviction counsel, the
appellant filed a timely motion for a new trial, which he amended on February
14, 2017, July 23, 2018, and August 8, 2018. Following a hearing on September
12, 2018, the trial court denied the appellant's motion for a new trial on
October 19, 2018. The appellant filed a timely notice of appeal, and his appeal
was docketed in this Court for the April 2019 term and submitted for decision
on the briefs.

evidence as to the offense of making a terroristic threat and contending that he received ineffective assistance of counsel. For the reasons set forth below, we reverse the appellant's conviction of making a terroristic threat and affirm his remaining convictions.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. In early 2012, Angelina Bryant was separated from her husband, the appellant, and staying with a friend, Fallion Simmons. Throughout the day on March 6, 2012, the appellant repeatedly called Bryant and sent her text messages that made her feel unsafe. That night, Bryant's close friend, Trina Nwoke, also spent the night at Simmons's apartment, and the calls and text messages from the appellant continued late into the night; Bryant decided to seek a temporary protective order the next day. On the morning of March 7, Bryant told Simmons and Nwoke that she was "really scared," and the women discussed ways Bryant could protect herself. Nwoke gave Bryant a Taser device to carry for self-protection. The appellant called Bryant several times that morning. As Bryant and Nwoke were preparing to leave to go

together to a restaurant, where they were seeking employment, and then to the police station, Bryant received another call. Bryant told Nwoke and Simmons it was the appellant and put the call on speaker-phone mode so her friends were able to listen. Bryant asked, "what do you want?" The appellant said, "you will regret this," and ended the call.

Approximately ten minutes after that phone call, Bryant and Nwoke were walking down the stairs outside Simmons's apartment when the appellant ran up to them from the direction of the balcony next door and started firing a gun. After the first or second shot, Bryant dropped to the ground, face first. The appellant moved past Bryant toward Nwoke and shot her in the abdomen; she fell back on the stairs. The appellant kneeled on Nwoke's body and shot her again multiple times. The appellant turned back to Bryant's prone body and shot her again in the back of the head. The appellant then walked to his car and drove away. When officers responded to the scene, Bryant was already dead. An officer asked Nwoke, who was still lying injured on the stairs, who had shot her, and she

3

responded, "Jason Bryant." The Bryants' three-year-old daughter, who had been standing with Simmons at the top of the stairs when the shooting started, told a detective, "Daddy shot Mommy." The appellant was arrested later that day, while he was waiting to pick up the Bryants' five-year-old son from kindergarten.

At trial, Bryant's mother testified that Bryant and the appellant had been married for about five years at the time of her death and had been separated for several months. She testified that approximately two to three months before the shooting, the appellant had beaten Bryant, seriously bruising her face. The night before the shooting, Bryant told her mother that she was upset about receiving a large number of text messages from the appellant that day and that she planned to get a restraining order as soon as possible; her mother described Bryant's demeanor as "shaken, nervous, uncomfortable." Later that night, Bryant's mother called the appellant, who seemed "upset and angry," and she counseled him that he needed to calm down if he wanted to reconcile with Bryant.

4

1. (a) The appellant contends that the State presented no evidence that he committed the offense of making a terroristic threat as charged in Count 6 of the indictment, which alleged that he "did threaten to commit Murder, a crime of violence, with the purpose of terrorizing [Bryant]." Specifically, the appellant contends that the only evidence of any threat offered by the State was testimony that, during his final phone call to Bryant, he told her "you will regret this," which, he argues, "is not an explicit threat to murder." The appellant argues further that the jury was not authorized to consider his violent conduct after the final phone call as retroactively imbuing "you will regret this" with the requisite threatening meaning. He contends that the evidence failed to establish an implicit threat to murder Bryant because the circumstances surrounding the making of the threat included neither any mention of violence nor any acts of violence at the time the words were spoken.

When the sufficiency of the evidence is challenged on direct appeal, the proper standard of review is the test established in

*Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979), which requires that the evidence, viewed in the light most favorable to the jury's verdicts, must be sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *Dupree v. State*, 303 Ga. 885, 886 (1) (815 SE2d 899) (2018); *Dorsey v. State*, 303 Ga. 597, 600 (1) (814 SE2d 378) (2018). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Dorsey*, 303 Ga. at 600 (1) (citation and punctuation omitted).

At the relevant time, former OCGA § 16-11-37 (a) (2010) provided in pertinent part: "A person commits the offense of a terroristic threat when he or she threatens to commit any crime of violence . . . with the purpose of terrorizing another[.]"[2] As the Court

_____

[2] The same provision is now designated OCGA § 16-11-37 (b) (1), (2). See Ga. L. 2016, p. 811, § 2 (Act 606). We note that, before the 2016 amendment, former OCGA § 16-11-37 (c) provided: "A person convicted of the offense of a terroristic threat shall be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both . . . ." Effective May 3, 2016, the current Code section provides:

6

of Appeals has explained, under this Code section: "the State must establish two elements to sustain a conviction for making terroristic threats: (a) that the defendant threatened to commit a crime of violence against the victim, and (b) that the defendant did so with the purpose of terrorizing the victim." *Clement v. State*, 309 Ga. App. 376, 379 (1) (710 SE2d 590) (2011) (citation omitted). With regard to the first element, the plain and ordinary meaning of the word "threat" refers to "a communication, declaration, or expression of an intention to inflict harm or damage." *Edwards v. State*, 330 Ga. App. 732, 735 (2) (a) (769 SE2d 150) (2015) (citation and punctuation omitted). "The crime of making terroristic threats focuses solely on the conduct of the accused and is completed when the threat is communicated to the victim with the intent to terrorize." *Clement*, 309 Ga. App. at 379 (1) (citations and punctuation omitted).

---

A person convicted of the offense of a terroristic threat shall be punished as a misdemeanor; provided, however, that if the threat suggested the death of the threatened individual, the person convicted shall be guilty of a felony and shall be punished by a fine of not more than $1,000.00, imprisonment for not less than one nor more than five years, or both.

OCGA § 16-11-37 (d) (1) (2016). See Ga. L. 2016, p. 811, § 2.

In this case, the indictment specified that the crime of violence that the appellant allegedly threatened to commit was murder. And the record shows that the communication, declaration, or expression of an intention to commit the crime of murder identified by the State at trial was the appellant's statement in his final phone call to Bryant "you will regret this."[3] During the jury charge, the trial court instructed the jury that the State had the burden of proving beyond a reasonable doubt every material allegation of the indictment and every essential element of the offenses as alleged in the indictment and sent the indictment out with the jury during deliberations. [4]

---

[3] In opposing the appellant's motion for a directed verdict as to Count 6, the State argued that the jury was authorized to find that "you will regret this" was a threat to murder the victim and to find that the appellant intended the threat to terrorize her based on the circumstances surrounding the threat, specifically that it was made ten minutes before the shooting. In the order denying the appellant's motion for a new trial, the court determined that the jury was authorized to find a threat to commit an act of violence, specifically murder, based on evidence that the appellant had said to Bryant "you will regret this" and that the comment, in conjunction with the appellant's repeated text messages, upset Bryant and made her not want to be alone with him, that she intended to get a restraining order against him, and that the appellant made the statement "you will regret this" ten minutes before he shot Bryant.

[4] In the charge to the jury, the trial court gave "the definition of terroristic threats and acts" as follows: "A person commits terroristic threats when that person threatens to commit any crime of violence with the purpose of terrorizing another [or] in reckless disregard of the risk of causing terror."

Patently, "you will regret this," without more, is not an explicit declaration of an intention to commit murder. But

> the specific form of a terroristic threat is not important. It need not take any particular form or be expressed in any particular words, and may be made by innuendo or suggestion. A communication is sufficient to constitute a threat if a reasonable person could conclude that it was a threat under the circumstances.

*Clement*, 309 Ga. App. at 379 (1) (a) (citations and punctuation omitted). Courts look therefore to the circumstances surrounding the utterance at issue.

In *Cook v. State*, 198 Ga. App. 886 (403 SE2d 872) (1991), for example, the defendant was charged with terroristic threats, specifically, threatening to murder the victim, based on his statement "I'm gonna get you" to the victim. 198 Ga. App. at 887 (2). The Court of Appeals found the evidence sufficient to sustain the verdict based on evidence of a preceding connected and explicit threat to kill the victim. Id. at 887 (2). In an earlier incident, the defendant went to the victim's home, threatened to kill her if she did not leave the house, took a gun from her bedroom, chambered a

9

bullet, took the safety off, and told her again that he would kill her if she did not leave. Id. at 886 (1). Ten days later, while the victim testified against the defendant at the bond hearing on charges arising from the first incident, the defendant gave her "looks . . . that scare you to death," as she described it. Id. After she testified, he passed her and said to her, "I'm gonna get you." Id. The Court of Appeals held that, although the defendant's words "may not specifically threaten death, the circumstances surrounding the utterance of [the] defendant's threatening words to the victim were sufficient to authorize the jury's finding that [the] defendant threatened the victim's life" in the second incident. Id. at 887 (2).

As noted above, the alleged threat was to murder Bryant, and the allegedly threatening communication, declaration, or expression was the appellant's statement in the final phone call, "you will regret this." The crime of making a terroristic threat was completed, if at all, when the appellant communicated the threat to Bryant with the intent to terrorize her. See *Clement*, 309 Ga. App. at 379 (1). The appellant's shooting of Bryant, albeit only ten minutes later, was not

10

part of his communication to her in that phone call. Because the appellant's conduct *after* the phone call was not part of his communication to her in that phone call, the shooting was not relevant to the determination whether a reasonable person could conclude, under the circumstances at the time of the communication, declaration, or expression at issue, that the appellant threatened to murder Bryant.[5]

Evidence of the circumstances surrounding the alleged threat to commit murder showed one incident of non-lethal violence against Bryant two to three months before the shooting (the battery that bruised her face) and the appellant's harassing conduct the day and night before the shooting (when he texted and called Bryant to the

---

[5] We note that although the shooting was not relevant to the first element of the offense — the determination whether "you will regret this" constituted a threat to commit murder as alleged in the indictment — this does not necessarily mean that the fact that the appellant killed Bryant ten minutes after the final phone call could not be relevant to the second element of the offense — whether the appellant intended to terrorize Bryant at the time of the communication, declaration, or expression at issue. See *Clement*, 309 Ga. App. at 380 (1) (b) ("Direct evidence that the threats [at issue] were made for the purpose of terrorizing another is not necessary if the circumstances surrounding the threats are sufficient for a trier of fact to find the threats were made for such a purpose." (citation and punctuation omitted)).

11

point that she was frightened enough to want a protective order[6]).

We conclude that this evidence, when viewed in context, was not sufficient to authorize the jury to find that a reasonable person could conclude that, when the communication, expression, or declaration "you will regret this" was made to the victim, the appellant was threatening to kill Bryant, as opposed to inflicting some other harm. Accordingly, the evidence was not sufficient to support the jury's verdict of a terroristic threat, and the appellant's conviction on Count 6 is reversed.[7]

(b) The appellant does not challenge the sufficiency of the evidence as to the remaining counts. Nevertheless, as is our

---

[6] As the appellant correctly notes, the content of the text messages and phone calls (other than the final phone call) was not before the jury.

[7] Compare *Hobbs v. State*, 334 Ga. App. 241, 243 (1) (779 SE2d 15) (2015) (the evidence was sufficient to find the defendant guilty of threatening to commit murder as alleged in the indictment where the communication, declaration, or expression at issue by the defendant, who was driving a car, shouting "I'll f—ing kill you!" to the victim, who was riding a motorcycle, and shouting that he would "run [the victim] over, knock [him] down, [and] kill [him]." (punctuation omitted)); *Martin v. State*, 303 Ga. App. 117, 119 (1) (692 SE2d 741) (2010) (the evidence was sufficient to find the defendant guilty of threatening to commit murder as alleged in the indictment where the communication, declaration, or expression at issue by the defendant was his saying to the victim "I'm gonna kill you[.]").

12

customary practice in murder cases, we have independently reviewed the record and conclude that the evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that the appellant was guilty of the crimes for which he was convicted. See *Jackson*, 443 U. S. at 319.

2. The appellant contends that he received ineffective assistance of counsel in several respects. To prevail on a claim of ineffective assistance, the appellant must prove both that the performance of his lawyer was deficient and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that his lawyer's performance was deficient, the appellant

> must show that the lawyer performed [her] duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. And to prove that he was prejudiced by the performance of his lawyer, [the appellant] must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Carr v. State*, 301 Ga. 128, 129 (2) (799 SE2d 175) (2017) (citations and punctuation omitted). This burden is a heavy one, see id., and we conclude that the appellant has failed to carry it.

(a) *Plea negotiations and decision.* The appellant contends that his counsel was ineffective for failing to facilitate his desire to plead guilty. He argues that, prior to trial, the State was willing to accept a guilty plea to murder and to recommend a life sentence, with parole eligibility. He asserts that he wanted to plead guilty and that his trial counsel refused to carry out that wish and insisted that the case go to trial in a vain attempt to obtain a verdict of voluntary manslaughter as a lesser offense to malice murder. He argues that, although he went along with his counsel's plan, she failed to advise him of several considerations necessary to making an informed decision whether to plead guilty or go to trial, including that, if he did not testify at trial to provide evidence of his mental and emotional state at the time of the shooting, the court would not charge the jury on voluntary manslaughter, because there would be no evidence of a serious provocation sufficient to excite a sudden,

violent, and irresistible passion. He contends that his counsel should have advised him that, even if he testified, he was still more likely to be found guilty of murder and to be sentenced to life without parole because of his past domestic violence and the nature of the shooting. In addition, he contends that counsel's performance was deficient in going to trial without knowing whether he was committed to testifying in his defense, while having no alternative defense to present if he ultimately declined to testify. The appellant argues that he was harmed by his counsel's allegedly deficient performance because, with the life sentence the State had been willing to recommend if he pleaded guilty to murder, he would have been eligible for parole after 30 years, and instead he was sentenced to life plus 25 years with no possibility of parole.

"[P]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer [counsel's] informed opinion as to what plea should be entered." *Cammer v. Walker*, 290 Ga. 251, 255 (2) (719 SE2d 437) (2011) (citation and punctuation

omitted). After being provided informed legal advice, it is for the defendant, not the attorney, to make the ultimate decision about whether to accept or reject a plea offer. *Carr*, 301 Ga. at 129 (2) (b); *Johnson v. State*, 276 Ga. 57, 60 (4) (a) (573 SE2d 362) (2002).

> An attorney ordinarily may satisfy the duty to provide informed legal advice regarding a plea offer by discussing with the accused the risks of going to trial, the evidence against him or her, and differences in possible sentences that would be imposed following a guilty plea and following a conviction at trial.

*Cammer*, 290 Ga. at 255 (2) (citation omitted).

At the hearing on the appellant's motion for a new trial, he testified that he wanted to plead guilty to murder and to accept a life sentence and that counsel's reply was, "I'm not going to let you do that." According to the appellant, his counsel said that she was going to try to get an offer for him to plead guilty to voluntary manslaughter, which would make him eligible for less than a life sentence.[8] The appellant testified that his trial counsel "coerc[ed]"

---

[8] OCGA § 16-5-2 (a) provides:
A person commits the offense of voluntary manslaughter when he causes the death of another human being under

16

him into going to trial and "talked [him] into doing it" by making "it

sound good" and "encouraging [him] that that was the best route to

go." The appellant told his counsel that he did not want to put on the

record "sensitive information" about what Bryant had been doing,

---

circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

With regard to the factual basis for a potential plea to voluntary manslaughter, the appellant testified at the hearing on his motion for a new trial that he and Bryant were not estranged in March 2012. According to the appellant, after months of the family (the appellant, Bryant, and their two children) living with the appellant's mother because the appellant was having trouble finding a job, Bryant decided that she preferred to live with her own mother. Two days before the shooting, the appellant and Bryant spent the night together. While she slept, he went on Facebook and read a message from Nwoke's sister to the effect that Bryant and Nwoke had had "a threesome with some guy." He had also learned that Bryant and Nwoke had been going to strip clubs on amateurs' night and otherwise doing things behind his back that he found offensive. He blamed Nwoke for being a bad influence on Bryant. The appellant testified that, on the day of the shooting, he felt that he no longer wanted to live, because he did not want to live without his wife in his life. His plan was to get on "bended knee" in front of his wife, put his gun to his head, and kill himself in front of her so that she would see how badly she had hurt him. He did not know that Nwoke would be there that day, and, when he saw her and heard her voice, his "whole perspective changed," his "pain got switched," he "was blinded by rage," he was "fueled with anger," and he "took [his] anger out" on Bryant and also on Nwoke, "because she was encouraging [his] wife" in behavior that was "unnatural for a wife." He testified that he did not intend to kill Bryant or Nwoke, "that's just what happened afterwards."

17

but his counsel explained and "made clear" that he would have to testify if the case went to trial. According to the appellant, he told his counsel that he "might" testify. Once the State rested, the appellant decided not to testify, against his lawyer's advice that it was in his "best interest to testify" so the jury would know his side of the story, because it was "a very touchy situation" and he did not want his wife's "business being out there like that" in front of their two families.

At the hearing on the appellant's motion for a new trial, his trial counsel testified that she had requested a plea to voluntary manslaughter, which the prosecutor rejected. The only plea offer from the State was for malice murder and a life sentence, and she informed the appellant of that offer. According to counsel's recollection, the appellant decided to go to trial based on their discussion that the only way for him to be convicted of anything less than malice murder was a trial and a jury decision. Counsel explained to him that, to establish the facts on which to base a request to charge for voluntary manslaughter, it was necessary for

18

him to testify. According to counsel, when she announced ready for trial, she fully believed that the appellant was going to testify. When the appellant told her after the close of the State's evidence that he had decided not to testify, she reminded him then that his voluntary manslaughter defense hinged on his testimony. It seemed to counsel that the appellant had resigned himself to the likelihood that they were going to lose, and he was worried about his mother having to watch him testify.

After assessing the credibility of both the appellant and his trial counsel, the trial court determined that the appellant wanted to plead guilty, but he voluntarily decided not to accept the State's only offer: a guilty plea to murder and a life sentence. The court found that the appellant's trial counsel believed that the appellant had a chance of being convicted of the lesser offense of voluntary manslaughter if he testified at trial but that the appellant independently made the decision not to testify after the State rested. Although the appellant may now regret his decision, the court found, the evidence did not show that his trial counsel was deficient in how

she handled the plea negotiations. The trial court was entitled to believe counsel's testimony that she discussed with the appellant the risks of going to trial, the evidence against him, the effect of evidence of the earlier beating, the mandatory life sentence, and the possible sentence of life without parole should he be found guilty of murder at trial. And the trial court was entitled to disbelieve the appellant's testimony that counsel did not communicate that, if he went to trial and opted not to testify, the jury would not be instructed about the voluntary manslaughter option. See *Cammer*, 290 Ga. at 256 (2). Given this, the trial court's determination that counsel's performance was not deficient was supported by evidence from the record. Inasmuch as the appellant has not established that trial counsel was deficient in her duty to provide informed legal advice, the appellant has not proven the first prong of a claim of ineffective assistance of counsel. See *Carr*, 301 Ga. at 130 (2) (b) (counsel was not deficient for failing to "lock[ ] down the State's original plea offer" where counsel testified that the appellant would not accept the offer unless it was "whittled down"(punctuation

omitted)).

(b) *Failure to make hearsay and Confrontation Clause objections.* The appellant contends that his counsel's performance was deficient in failing to object on hearsay and Confrontation Clause grounds to the detective's testimony, when asked to describe the demeanor of the two young children at the scene, the Bryants' daughter and Simmons's child, that he heard the Bryants' daughter say, "Daddy shot Mommy." At the hearing on the appellant's motion for a new trial, trial counsel testified that she strategically opted not to object, because the statement was not responsive to any question and because she did not want to "ring that bell again" and draw the jurors' attention to the statement by objecting. Even if it was deficient performance not to object, the evidence identifying the appellant as the shooter was overwhelming, and, therefore, the appellant has not shown any likelihood that, but for counsel's decision not to object, the outcome of the trial would have been more favorable if counsel had made and prevailed on a Confrontation Clause objection. The appellant therefore has not shown any

21

resulting prejudice. See *Henderson v. State*, 304 Ga. 733, 737-738 (3) (c) (822 SE2d 228) (2018); *Ardis v. State*, 290 Ga. 58, 63 (2) (b) (718 SE2d 526) (2011).

(c) *Cross-examination of two eyewitnesses*. The appellant contends that his counsel's performance was deficient in failing to cross-examine two eyewitnesses about their on-the-scene descriptions of the shooter, because their descriptions were of a shorter man and one who weighed much less than the appellant weighed at the time, according to the police report.[9] He argues that counsel's performance was deficient in failing to have a viable backup defense plan in the event he decided not to testify and in failing to attempt to sow doubt by cross-examining these two witnesses regarding their estimates of the shooter's height and weight.

At the hearing on the appellant's motion for a new trial, trial

---

[9] One of the witnesses lived in a nearby apartment; the other was visiting a resident. Both, after hearing gunshots, glimpsed a man leaving the area of the shooting. They described the man they saw, including estimating his height and weight.

counsel explained that there was no reason to try to impeach the eyewitnesses' identification testimony, because the plan at the time of their testimony was for the appellant to admit to being the shooter and to testify about his emotional state in an effort to get a voluntary manslaughter verdict. "An attorney's decision about which defense to present is a question of trial strategy." *Hendrix v. State*, 298 Ga. 60, 62 (2) (a) (779 SE2d 322) (2015) (citation and punctuation omitted). "Generally, a matter of reasonable trial strategy and tactics does not constitute ineffective assistance of counsel[,]" and, "hindsight has no place in an assessment of the performance of trial counsel." *Hampton v. State*, 295 Ga. 665, 670 (2) (763 SE2d 467) (2014) (citations and punctuation omitted). Specifically, "[t]he decision whether to impeach a witness is a matter of trial strategy that typically will not support a claim of ineffective assistance." *Dinkins v. State*, 300 Ga. 713, 716 (4) (b) (797 SE2d 858) (2017) (citation omitted). In this case, the appellant failed to show that counsel's representation fell outside the wide range of reasonable professional conduct, or that her decisions were not made in the

exercise of reasonable professional judgment based on the circumstances at the time she made the decision. See *Walker v. State*, 294 Ga. 752, 756-757 (2) (c) (755 SE2d 790) (2014).

3. The appellant contends that, in the jury charge, the trial court failed to limit the jury to finding him guilty of making a terroristic threat only if the State proved that the appellant "threaten[ed] to commit Murder" as alleged in the indictment. Our reversal of the appellant's terroristic threat conviction renders moot his argument about the jury instruction.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED SEPTEMBER 3, 2019.
Murder. DeKalb Superior Court. Before Judge Jackson.
*Charles H. Frier*, for appellant.
*Sherry Boston, District Attorney, Destiny H. Bryant, Assistant*

*District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.